IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| KAYLA ROUSE and ROBERT ROUSE as Next Friends for AURORA ROUSE  )<br>)<br>)<br>**Plaintiffs,**   )<br>)<br>vs.   )<br>)<br>SINGING RIVER HEALTH SYSTEM, d/b/a )<br>SINGING RIVER HOSPITAL, )<br>DONALD K. GADDY, M.D., )<br>BRADLEY GOLDENBERG, M.D., and )<br>TERESA MONROE, R.N.,   )<br>)<br>**Defendants.**   ) | Cause No: **1:23cv99 LG-RPM** |

**COMPLAINT FOR DAMAGES**
(JURY TRIAL REQUESTED)

**COME NOW** Plaintiffs, Kayla Rouse and Robert Rouse, as Next Friends of AURORA ROUSE, by and through their attorney, Walter C. Morrison of the law firm Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC, and for their cause of action against Defendants Singing River Health System, d/b/a Singing River Hospital, Donald K. Gaddy, M.D., Bradley Goldenberg, M.D., and Teresa Monroe, R.N., state and allege as follows:

**A. PARTIES**

1.     Plaintiffs are citizens of the State of Texas.   Plaintiffs, Kayla Rouse and Robert Rouse, are the natural mother and father of Aurora Rouse, a minor child, born on December 29, 2021.

2.     At all relevant times herein, Defendant Singing River Health System, doing business as Singing River Hospital (hereinafter "Singing River Hospital") was a political

1

subdivision of Jackson County, Mississippi. Defendant Singing River Hospital can be served by mail on its Chief Legal Officer, Jaklyn Wrigley, by agreement.

3. At all relevant times herein, Donald K. Gaddy, M.D. (hereinafter "Gaddy"), was an OB/GYN practicing medicine at Singing River Hospital in Gulfport, Mississippi. Dr. Gaddy is a duly licensed physician engaged in the practice of medicine, representing and holding himself out to the public as a medical doctor who practices obstetrics at Singing River Hospital. Defendant Gaddy can be served by mail on his attorney, Whitman B. Johnson III, by agreement.

4. At all relevant times herein, Bradley Goldenberg, M.D. (hereinafter "Goldenberg"), was a neonatologist practicing medicine at Singing River Hospital in Gulfport, Mississippi. Dr. Goldenberg is a duly licensed physician engaged in the practice of medicine, representing and holding himself out to the public as a medical doctor who practices neonatology at Singing River Hospital. Defendant Goldenberg can be served personally at his place of business, Singing River Hospital, located at 15200 Community Road, Gulfport, MS 39503.

5. At all relevant times herein, Defendant Teresa Monroe, R.N., (hereinafter 'Monroe') was a duly licensed registered nurse engaged in the practice of labor and delivery nursing care, representing and holding herself out to the public as a nurse who provides care to laboring mothers and their babies. Defendant Monroe can be served personally at her place of business, Singing River Hospital, located at 15200 Community Road, Gulfport, MS 39503.

6. The doctrine of vicarious liability applies to the claims made herein against Singing River Hospital, for the acts or failures to act of its employees or agents responsible for the medical care provided to Kayla Rouse and Aurora Rouse, including its nursing staff.

## B. JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction over all claims made herein pursuant to 28 USC §1332 (a)(1) because the plaintiffs and the defendants are citizens of different States and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

8.   This Court is the appropriate venue for these claims pursuant to 28 USC §1391 (b)(2) because the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

9.   Proper written notice of intention to file this action has been provided to the Defendants via certified mail, return receipt requested, pursuant to Miss. Code Ann. sections 15-1-36 (15) and 11-46-11(1).

### C. COMPLIANCE WITH STATUTES

10.   Proper written notice of the intention to file this action has been provided to the Defendants via certified mail, return receipt requested, in accordance with Miss. Code Ann. §15-1-36 and §11-46-11.  See Notices of Claim and return receipts attached as Exhibit "A."

11.   Pursuant to the requirements of Miss. Code Ann. §11-1-58(1)(a), a Certificate of Compliance and expert consultation is attached hereto as Exhibit "B."

### D. FACTS

12.   At all pertinent times herein, Defendant Singing River Hospital owned, possessed, controlled and/or managed the facility known as Singing River Hospital, located at 15200 Community Road, Gulfport, MS 39503.

13.   At all pertinent times herein, Singing River Hospital held itself out and represented to the public in general and to Kayla Rouse in particular, as a medical institution offering trained, competent, skilled and capable staff, doctors and nurses in the care and

treatment of patients, including pregnant mothers and expected babies.

14. Kayla Rouse's pre-natal course was complicated by pregnancy induced hypertension beginning the third trimester.

15. At 37.6 weeks gestation, Kayla Rouse presented to Singing River Hospital on December 27, 2021, at approximately 1540 hours, for induction of labor, at the instruction of nurse practitioner Katherine Gaddy. Kayla Rouse was admitted to the care of Defendant Dr. Gaddy with a diagnosis of gestational hypertension with superimposed preeclampsia.

16. Upon presenting to Singing River Hospital, Kayla Rouse was given two doses of Cytotec and placed on a fetal heart monitor in the labor and delivery unit. Defendant Gaddy was notified of her elevated blood pressure, and she was placed on a labetalol protocol for hypertension control.

17. Initially, in the overnight hours of December 27-28, the fetal heart monitoring appeared reassuring, with moderate variability, accelerations and an absence of decelerations.

18. At or around 2000 hours on December 27, 2021, a cervical examination was performed by Nurse Gina Rivenbark, RN, and Kayla Rouse was found to be 1/50/-3.

19. Blood pressure monitoring for Kayla Rouse revealed significantly elevated blood pressures over the next several hours, reaching as high as 187/107 before 200 mg of Labetalol po was administered to the patient. The standard of care required that Aurora Rouse be delivered once multiple serial blood pressure readings above 160/110 occurred given her preeclampsia and over 37 weeks gestation.

20. At 0619 hours on December 28, 2021, Nurse Rivenbark began administering Pitocin to induce labor, beginning with a dosage of 2 ml/min. Between 0619 hours and 0900 hours,

4

the Pitocin was increased to 16 ml/min.

21.     Defendant Gaddy evaluated his patients at or around 0900 on December 28, 2021. Kayla Rouse had not progressed with cervical change and was found by Defendant Gaddy to be at 1/30/-3. Defendant Gaddy was unable to rupture membranes. Nevertheless, and despite knowing about the persistently elevated blood pressures on a patient with severe preeclampsia, Defendant Gaddy ordered continued increasing of the Pitocin up to 30 ml/min.

22.     Defendant Monroe was assigned the labor and delivery nursing care during the hours of 0700 to 1900 on December 28, 2021. Based on orders from Defendant Gaddy, Defendant Monroe continued administering the high alert, high risk medication, Pitocin, to induce labor, doing so even as the fetal heart tracing began to show diminished variability and an absence of accelerations and maternal blood pressures that revealed persistent severe preeclampsia even with the ongoing administration of Labetalol.

23.     At or around 1124 hours, Defendant Gaddy again came to the bedside. Pitocin had been increased by this time to 20 ml/min. Yet Defendant Gaddy found no cervical changes – no progress of labor at all. Defendant Gaddy reviewed the fetal heart rate tracing and was in position at that time to know that what had initially been a Category I fetal heart rate tracing was now showing diminished variability and an absence of accelerations – a Category II tracing. The maternal blood pressure most recently taken was 183/104. The standard of care required that he deliver Aurora Rouse at this time via cesarean section, but Defendant Gaddy chose to continue with a vaginal delivery.

24.     Despite the non-reassuring heart rate tracings, Defendant Monroe increased the Pitocin from 2 ml/min to 30 ml/min from 0657 hours to 1735 hours. By 1420 hours, the fetal heart

tracings revealed extremely elevated resting tone between contractions, and minimal variability bordering on absent variability. The standard of care required that Defendant Gaddy be notified of the Category II fetal heart tracings and that Defendant Monroe turn off the Pitocin, or at a minimum turn it down as a nursing intervention instead of increasing the dosage.

25. By 1715 hours, the fetal heart tracings began showing persistent variable decelerations of the fetal heart rate.

26. Defendant Gaddy evaluated the patients at or around 1734 hours. No progress of labor had occurred. Pitocin was dripping at a rate of 28 mil/min in the face of non-reassuring Category II fetal heart tracings. The standard of care required that he take his patients to the operating room and deliver the baby by cesarean section. Instead, Defendant Gaddy went home for the night.

27. Defendant Gaddy turned over the obstetrical care to the on-call physician (believed to be a hospitalist, Dr. Robles, MD) at or around 1800 hours. Defendant Monroe updated Dr. Robles of the patients' condition at 1830 hours.

28. At 2030 hour on December 28, 2021, Dr. Robles reviewed the fetal heart tracings and ordered that the Pitocin be stopped.

29. Nurse Sarah Ratcliff, RN, took over the labor and nursing care at or around 1900 hours and turned off the Pitocin at 2030 hours on December 28, 2021.

30. At 2146 hours, Dr. Robles reviewed the fetal heart monitor and noted that that the variability of the fetal heart rate was decreased or absent.

31. At 2240 hours, on December 28, 2021, Dr. Robles evaluated his patients at bedside, reviewed the fetal heart tracings and noted that the baby 'still has decreased variability.' A clear

failure to progress with labor had occurred, despite a dosage of Pitocin of 30 ml/min.

32.     At approximately midnight on December 28-29, the fetal heart monitor showed almost an absence of variability – evidence of a Category III tracing. This non-reassuring tracing was evidence of acidemia and persisted for hours. The standard of care required that Nurse Ratcliff perform nursing interventions and when the non-reassuring fetal heart tracing continued, to immediately notify the on call obstetrician so that bedside evaluation by a physician and urgent delivery of Aurora Rouse would occur to save her from hypoxic ischemic brain injuries.

33.     Defendant Monroe returned to duty to take care of the laboring patients at or around 0700 on December 29. At or around 0733 hours, a call was placed by Defendant Monroe to Defendant Gaddy to provide him with a status update. Defendant Gaddy was advised that the fetal heart tracing was non-reassuring, had minimal variability, was non-reactive and that the patient continued to have increased blood pressure readings.

34.     Despite the non-reassuring fetal heart rate tracings, Defendant Gaddy chose not to come to the bedside and deliver the baby, but instead to restart the Pitocin. Defendant Monroe chose not to advocate for her patient or go up the chain of command to deliver a baby who clearly was in fetal distress and needed to be saved from what had become an environment hostile to life.

35.     During all these times, no notable progression of labor is documented, despite Pitocin being administered to Kayla Rouse as high as 30 ml/min.

36.     At or around 0855 hours, Defendant Monroe again sought help from Defendant Gaddy, calling him to tell him that their patient was having prolonged late decelerations and minimal variability. Although Defendant Gaddy instructed Defendant Monroe to turn off the Pitocin again and promised that a 'provider' would come and evaluate the patient, he still did not

come to the bedside or put in motion delivering the baby by emergency cesarean section, as the standard of care required.

37. After no provider came to do something to help her patients, Defendant Monroe again called Defendant Gaddy at or around 1113 hours. She notified Defendant Gaddy that the patient had prolonged decelerations and minimal to no variability – a Category III, non-reassuring fetal heart rate tracing. At this time, Defendant Gaddy finally chose to perform a cesarean section, and he told Defendant Monroe to contact Dr. Hanna to see if she was closer to the hospital and could perform the cesarean section.

38. At 1115 hours, Defendant Monroe spoke to Dr. Hanna, who told her that she was not near the hospital. Defendant Monroe then spoke again with Defendant Gaddy, who told her he was on his way to the hospital to perform the cesarean section.

39. The standard of care requires that once a decision is made for an emergency cesarean section no longer than 30 minutes should go by before the incision is made to deliver the baby.

40. Aurora Rouse was not delivered until 1251 hours, over one hour longer than what the standard of care required, once the decision was finally made to deliver her.

41. When Aurora Rouse was delivered, she appeared neurologically compromised, and she required extensive resuscitation by the neonatal care team. She was bradycardic, hypotonic, apneic, cyanotic, without respiration effort or crying and surrounded by thick meconium, sufficient to compromise ventilation. Nevertheless, no cord gases were sent to the lab to assess the level of acidosis being experienced by the baby and the baby was not taken to the NICU.

42. Initial glucose levels for Aurora Rouse show that she was severely hypoglycemic.

Nevertheless, Defendant Goldenberg permitted his patient to breastfeed and stay with her mother. Aurora Rouse began to experience tonic clonic seizures at or around 1745 hours on December 29, 2021. The parents' requests that she be transferred to a children's hospital NICU were initially rebuffed by Defendant Goldenberg. Hours passed when Aurora Rouse qualified for and should have been receiving the cooling protocol before she was finally transferred to the Children's Hospital of New Orleans.

43. Once at Children's Hospital of New Orleans, baby Aurora was diagnosed with perinatal hypoxic ischemic encephalopathy. MRI findings revealed global hypoxic ischemic encephalopathy primarily involving cerebral hemispheres, midbrain and brainstem. EEG findings were abnormal, consistent with diffuse cerebral dysfunction and cortical irritability.

### E. COURSE OF ACTION
### MEDICAL MALPRACTICE

44. Plaintiffs, Kayla Rouse and Robert Rouse, as Next Friends of Aurora Rouse, bring claims of medical negligence against the defendants Singing River Hospital, Gaddy, Goldenberg, Monroe, each of which failed to meet the minimum standards of care required by their respective professions.

45. Defendants, and each of them, had a duty to provide good, safe medical care to their patients, complying with the minimum standards of care for members of their respective professions confronting the same or similar circumstances.

46. The injuries to Aurora Rouse were the direct and proximate result of the negligence of Defendant Gaddy in one or more of the following particulars:

    a.    Dr. Gaddy failed to timely recognize warning signs of fetal distress and/or of

hypoxic ischemic insult to Aurora Rouse;

b. Dr. Gaddy mismanaged Pitocin, including but not limited to continuing it at a dosage that was unsafe and contrary to ACOG guidelines and the FDA and manufacturer warnings;

c. Dr. Gaddy mismanaged a laboring mother who had pregnancy induced hypertension, superimposed with preeclampsia, persisting despite the administration of Labetalol and who had a failure to progress despite high levels of Pitocin being administered to her.

d. Dr. Gaddy failed to perform a timely emergency cesarean section at multiple times on December 28 and 29; and

e. Dr. Gaddy failed to timely come to the hospital the morning of December 28, despite knowing or having should have known that his patient needed to be emergently delivered.

47. The injuries to Aurora Rouse were the direct and proximate result of the negligence of Defendant Singing River Hospital by and through the actions of Defendant Monroe and/or Nurse Ratcliff in one or more of the following particulars:

a. Failure to adequately evaluate the progress of labor and correct the lack of progress;

b. Failure to recognize warning signs of a non-reassuring heart rate tracing and to provide appropriate nursing interventions;

c. Mismanagement of the Pitocin by Defendant Monroe, including but not limited to continuing it at a dosage that was unsafe and contrary to AWHONN guidelines and the FDA and manufacturer warnings;

    d.      Failure to be an advocate for their patients or to go up the chain of command; and

    e.      Failure to report non-reassuring Category II tracings or Category III

           tracings to Defendant Gaddy or to the on-call overnight physician.

48.     The injuries to Aurora Rouse were the direct and proximate result of the negligence of Defendant Goldenberg in one or more of the following particulars:

    a.      Dr. Goldenberg failed to timely recognize that Aurora Rouse had been neurologically compromised during the laboring process, so that appropriate resuscitative measures could implemented;

    b.      Dr. Goldenberg ignored warning signs that Aurora Rouse was deteriorating after her birth;

    c.      Dr. Goldenberg ignored or rebuffed the requests of Kayla Rouse and Robert Rouse that their daughter be transferred to a specialty children's hospital; and

    d.      Dr. Goldenberg failed to timely transfer Aurora Rouse to a specialty children's hospital so that cooling protocols could be used to mitigate the affects of hypoxic ischemic injury to Aurora.

49.     The negligence, as set forth herein in paragraphs 44, 45, and 46 to Kayla Rouse and Aurora Rouse, directly and proximately caused injury to Aurora Rouse.

50.     The negligence of the nursing staff, to the extent they are employees or agents of Singing River Hospital, is imputed to Singing River Hospital under the terms of the Mississippi Tort Claims Act and the doctrine of vicarious liability. For purposes of M.C.A. §15-1-36 (15), the above recited deviations from the standards of care and negligent acts or omissions form the legal basis of this claim.

51. As a direct and proximate cause of the above described negligence of the Defendants Singing River Hospital, Gaddy, Monroe, and Nurse Ratcliff, Aurora Rouse was not timely delivered before hypoxic ischemic injuries occurred.

52. As a direct and proximate cause of the above described negligence of Defendant Goldenberg, Aurora Rouse was not timely provided necessary medical care that would have mitigated her hypoxic ischemic brain injuries and subsequent encephalopathy.

53. Defendants had a duty to provide good, safe medical care to Aurora Rouse and to Kayla Rouse. Defendants' choices and actions, individually and collectively, caused needless, preventable harm to their patient. Had good, safe and timely medical choices been made, as the standards of medical care required, Aurora Rouse would not have suffered the catastrophic brain injuries she has experienced.

## F. DAMAGES

54. Such negligence of one or more of the Defendants, in one or more of the respects alleged above, directly and proximately caused or directly contributed to cause damage and/or injuries to Plaintiffs as set forth below:

   a. Plaintiff Aurora Rouse suffered diffuse brain injuries throughout her brain and into the brain stem that are permanent and disabling;

   b. Plaintiff Aurora Rouse has suffered, and will suffer, from brain damage caused by acute hypoxic ischemic insult during the labor and delivery process, resulting in cerebral palsy that will lead to permanent cognitive and motor dysfunction and impairment;

   c. That Plaintiff Aurora Rouse has in the past and will in the future suffer great

        physical and mental anguish;

d.      That Plaintiff Aurora Rouse has in the past and will in the future suffer life changing pain and suffering as a result of her injuries;

e.      That Plaintiff Aurora Rouse has in the past and will in the future suffer loss of life's pleasures and/or enjoyments;

f.      That Plaintiff Aurora Rouse has in the past and will in the future incur substantial medical expenses and bills for and including, but not limited to, medical and health care evaluations, treatments, procedures, testing, surgeries, prescriptive expenses, devices, attendant care, hospitalizations, and medication;

g.      That Plaintiff Aurora Rouse has been in the past and will be in the future subjected to medical and health care evaluations, treatments, procedures, testing, surgeries, prescriptive expenses, devices, hospitalizations, and medication; and

h.      That Plaintiff Aurora Rouse has in the past and will in the future suffer a greatly impaired, decreased, and diminished work capacity, ability to work, and employability.

54.      As a direct and proximate result of the negligence of the defendants as set forth herein, Aurora Rouse, by and through her parents Kayla Rouse and Robert Rouse are entitled to recover the full measure of monetary damages available under Mississippi law.

WHEREFORE, Plaintiffs Kayla Rouse and Robert Rouse pray that this Court grant Plaintiffs judgment against Defendants, for actual and compensatory damages in a sum that is fair and reasonable, for Plaintiffs' costs herein, for post-judgment interest and for such other relief as is just and proper under the circumstances.

Respectfully submitted,

*/s/ Walter Morrison*

Walter C. Morrison, IV, Esq. (MSB# 9653)
GAINSBURGH, BENJAMIN, DAVID
MEUNIER & WARSHAUER, LLC
240 Trace Colony Park Dr., Ste. 100
Ridgeland, MS 39157
Telephone: 601-933-2054
Email: wmorrison@gainsben.com
*Attorney for Plaintiffs*